## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

ROGER BRANDON HEARON,            )
                                 )
            Plaintiff,           )
                                 )
v.                               )        CIVIL ACTION NO. 3:14-18229
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of Social Security,  )
                                 )
            Defendant.           )

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-

1383f. This case presently is pending before the Court on the Parties' cross-Motions for Judgment

on the Pleadings. (Document Nos. 12 and 13.) Both parties have consented in writing to a decision

by the United States Magistrate Judge. (Document Nos. 4 and 6.)

The Plaintiff, Roger Brandon Hearon (hereinafter referred to as "Claimant"), filed

applications for DIB and SSI on February 23, 2011 (protective filing date), alleging disability as

of January 1, 2008, due to "learning disability, bipolar, anger management problems, problems

getting along with others, problems reading and understanding English, problems writing and

spelling, comprehension problems, short memory, anxiety, [and] migraine headaches." (Tr. at 10,

142-47, 148-56, 167, 171.) The claims were denied initially and upon reconsideration. (Tr. at 10,

61-64, 65-67, 70-72, 81-83, 85-87, 88-90, 92-94, .) On November 14, 2011, Claimant requested a

hearing before an Administrative Law Judge (ALJ). (Tr. at 95-96.) The hearing was held on

December 28, 2012, before the Honorable Robert B. Bowling. (Tr. at 26-60.) By decision dated

February 1, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-20.) The ALJ's decision became the final decision of the Commissioner on April 8, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On June 12, 2014, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth

2

and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2) (2013).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since January 1, 2008, the alleged onset date. (Tr. at 12, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "an organic mental disorder, an affective disorder, a personality disorder, and a substance addiction disorder," which were severe impairments. (Tr. at 12, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 12, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations:

> [T]he work must be limited to simple, routine, and repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple, work-

related decisions and with few, if any, work place changes. Finally, the [C]laimant
should only occasionally interact with the public and coworkers.

(Tr. at 15, Finding No. 5.) At step four, the ALJ found that Claimant was able to perform his past

relevant work as a cleaner and a potato peeler. (Tr. at 18, Finding No. 6.) On the basis of testimony of

a Vocational Expert ("VE") taken at the administrative hearing, the ALJ further concluded that

Claimant could perform jobs such as a laundry worker and groundskeepr, at the unskilled, medium

level of exertion; as a small products assembler and house sitter, at the unskilled, light level of exertion;

and as a bench worker and a final assembler, at the unskilled, sedentary level of exertion. (Tr. at 19-

20, Finding No. 6.) On these bases, benefits were denied. (Tr. at 20, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the

claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined

as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be somewhat
> less than a preponderance. If there is evidence to justify a refusal to direct a verdict
> were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640,

642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts

in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must

not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole

to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397

(4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

6

Claimant's Background

Claimant was born on January 7, 1984, and was 28 years old at the time of the administrative hearing, December 28, 2012. (Tr. at 18, 144, 148.) Claimant had an eighth grade, or marginal education and was able to communicate in English. (Tr. at 18, 170, 172.). Claimant had past relevant work as a cleaner and potato peeler. (Tr. at 18, 173, 178-91.)

The Medical Record.

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.[2]

*William J. Given, M.A.*:

On September 25, 2008, Mr. Given, a licensed psychologist, conducted a mental status examination and mental testing, at the request of the West Virginia Disability Determination Service ("DDS"). (Tr. at 326-34.) Claimant reported learning deficits that required special education attention in school, difficulty remembering things, paranoia, a dislike of being around others, anger control problems, bipolar disorder. (Tr. at 327.) He stated that normal interaction with others caused frequent anger and control problems, poor sleep, audible hallucinations, racing thoughts, and some panic attacks. (Id.) Claimant indicated that his uncontrollable anger led him to quit or caused him to be fired from every job that he had. (Tr. at 328.) Claimant reported excessive alcohol use for the last two or three years, and that he drank eight to ten beers and six or seven shots of whisky, three or four times a week for the last year. (Tr. at 328-29.) He dropped out of school at the age of 16 when in the eighth grade because he was "too far behind." (Tr. at 329.) He was retained twice in the sixth, seventh, and eighth grades and had learning deficits in all subjects. (Id.) He attempted to obtain his GED when on probation several years earlier, but was unable to obtain it. (Id.) He obtained a learner's driver permit

---

[2] Claimant alleges error only respecting his mental impairments. The Court therefore, limits the summary of the evidence to that related to Claimant's mental impairments.

at the age of 16, upon his second or third attempt. (Id.)

On mental status examination, Mr. Given observed that Claimant maintained adequate eye contact, displayed an appropriate sense of humor, gave appropriate responses, spoke spontaneously, and exhibited clear speech. (Tr. at 330.) Claimant was oriented and alert, had a normal mood and appropriate affect, and his insight was fair. (Tr. at 331.) Nevertheless, Mr. Given assessed mild deficiencies in immediate memory and social functioning; moderate deficiencies in judgment and remote memory; and marked deficiencies in recent memory and concentration. (Tr. at 331, 333.) Results of the WAIS-III revealed a Verbal IQ of 66, a Performance IQ of 62, and a Full Scale IQ of 62. (Tr. at 331.) Mr. Given concluded that the WAIS-III results were invalid because Claimant responded "don't know" to half of the verbal items and his results considerably were lower than expected when compared to his expressive skills, understanding of the examiner's intentions, and sense of humor. (Tr. at 332.) Results of the WRAT-3 revealed that Claimant was reading at a second grade level and performed math and spelling at a first grade level. (Id.) Mr. Given assessed that the results "likely provide a reasonably valid estimate of his academic skills, consistent with his report of early educational experiences." (Id.)

Mr. Given diagnosed alcohol dependence, with psychological dependence; alcohol induced psychotic disorder, with hallucinations, with onset during withdrawal; opioid abuse; reading disorder NOS; mathematics disorder; mood disorder NOS; features of attention-deficit/hyperactivity disorder; and a provisional diagnosis of borderline intellectual functioning. (Tr. at 332.) He noted Claimant's daily activities to have included playing video games, watching television, listening to the radio, performing personal care, eating out several times a week, playing with his daughter at least once weekly, taking out the trash, and cleaning his room twice a week. (Tr. at 333.) Mr. Given opined that Claimant's prognosis was poor, his persistence especially was poor, and his pace was variable from

very slow to very quick discontinuance. (Tr. at 333-34.) He further opined that Claimant's ability "to attend regularly or keep a daily schedule is hampered by sleep disorder and intermittent withdrawal symptoms." (Tr. at 334.)

_Penny O. Perdue, M.A._:

On March 31, 2009, Ms. Perdue conducted a mental status evaluation, at which time Claimant reported daily depression with a two to three year history, lack of interest in things, poor appetite, excessive sleeping, low energy, feelings of worthlessness, poor concentration, and hallucinations when he attempts to sleep. (Tr. at 335-38.) Ms. Perdue noted on mental status examination that Claimant appeared with fair grooming and hygiene, was cooperative and interacted appropriately, maintained adequate eye contact, gave adequate verbal responses without spontaneous generation of conversation, and exhibited understandable, but mumbling speech. (Tr. at 336.) Claimant was oriented, had a somewhat depressed mood with a slightly restricted affect, and presented with fair insight and normal remote memory, social functioning, and persistence. (Tr. at 336-38.) Ms. Perdue opined that Claimant had mild deficiencies in judgment, concentration, pace, and immediate memory and marked deficiencies in recent memory. (Id.) She diagnosed major depressive disorder, single episode, unspecified; social phobia; and polysubstance dependence, early full remission. (Tr. at 337.) She noted excessive anxiety around others and past excessive use of alcohol, as well as excessive use of Xanax and Oxycodone in 2008. (Id.) She noted his activities to have included watching television, taking out the trash, helping with the chores, and maintaining his personal care. (Id.)

_Prestera Center for Mental Health Services_:

Claimant treated at Prestera Center for his mental impairments from April 27, 2009, through April 18, 2011. (Tr. at 436-83, 716-745, 746-76.) On April 18, 2011, Claimant requested outpatient services until he was able to find inpatient placement for or in a Suboxone clinic. (Tr. at 453, 763.) He

9

reported opiate abuse with daily use, withdrawal, and tolerance; anxiety with excessive worrying and agitations; loss of appetite and weight loss; low energy; hostility; hyposomnia with about ten to twelve hours of sleep per day; withdrawal; and poor concentration. (Id.) Mental status examination revealed that although he was withdrawn, he had normal speech, thought content, orientation, and memory. (Tr. at 454-55, 764-65.) He had deficient coping skills, a blunted affect, and agitated motor activity. (Tr. at 455, 765.) He was diagnosed with opioid dependence. (Tr. at 456, 766.)

Emily E. Wilson, M.A.:

On September 2, 2011, Ms. Wilson, a licensed psychologist, conducted a mental status examination at the request of DDS. (Tr. at 498-503.) Claimant denied symptoms of depression, unhappiness, sadness, or worrying. (Tr. at 499.) He also reported no change in his appetite, weight, or sleep and denied any difficulty sleeping. (Id.) Claimant reported that his main problem was his dislike to be around others. (Id.) Ms. Wilson noted on mental status examination that Claimant presented with average grooming and hygiene, was cooperative, interacted in a guarded and shy fashion, maintained intermittent eye contact, was oriented fully, exhibited relevant and coherent speech, and had a restricted and depressed mood and affect. (Tr. at 501.) Ms. Wilson opined that Claimant's persistence, pace, and immediate memory were within normal limits; his judgment and remote memory were below average; his concentration and recent memory were moderately deficient; and he exhibited slowed psychomotor activity. (Id.) Claimant reported that he did not have any friends and avoided associating with people. (Id.) Ms. Wilson diagnosed learning disorder NOS; history of alcohol, opioid, and anxiolytic abuse, by previous reports; personality disorder NOS, with features of paranoid, schizoid, antisocial, and borderline personality; and rule out borderline intellectual functioning. (Id.) She noted that her diagnoses were based on Claimant's reported symptoms and history. (Tr. at 501-02.) She opined that Claimant's prognosis was guarded if he was able to obtain consistent and appropriate psychotropic and

psychological intervention. (Tr. at 502.)

_Dr. Jeff Boggess, Ph.D._:

On September 12, 2011, Dr. Boggess, a state agency reviewing medical consultant, completed a form Mental RFC Assessment, on which he opined that Claimant had moderate limitations in his ability to interact appropriately with the general public and understand, remember, and carry out detailed instructions. (Tr. at 504-07.) He opined that Claimant retained "the ability for routine work like activity with limited contact with the general public." (Tr. at 506.) Dr. Boggess also completed a form Psychiatric Review Technique, on which he opined that Claimant's borderline intellectual functioning, depressive disorder NOS, and personality disorder NOS resulted in no restrictions of daily activities or episodes of decompensation of extended duration and moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (Tr. at 508-21.) Dr. Boggess noted that Claimant's primary issue was drug and alcohol abuse. (Tr. at 520.)

_Dr. Scott Davis, M.D._:

On March 29, 2012, Claimant reported bipolar disorder, depression, and anger management problems and that he had stopped seeking treatment from Prestera due to the way he felt after taking the prescribed medication. (Tr. at 540-41.) He stated that he occasionally drank a beer once a month and denied a history of illicit drug abuse. (Tr. at 540.) Dr. Davis advised Claimant to see a psychiatrist regarding the need for mood stabilizers for his bipolar, depression, and anxiety. (Tr. at 542.) Nevertheless, Dr. Davis prescribed Vistaril 25mg for anxiety. (Id.) Claimant acknowledged that he would consider returning to Prestera and would see Dr. Masilamani in the interim. (Id.) On May 10, 2012, Claimant reported that he was compliant with the Vistaril and intended to see Dr. Masilamani on May 30. (Tr. at 537.) Dr. Davis continued Claimant on the Vistaril for anxiety and sleep difficulties and initiated Propranolol 40mg to help with his worsened anxiety until his appointment with Dr.

Masilamani. (Id.) On September 13, 2012, Dr. Davis noted that Claimant was non-compliant with his Propranolol. (Tr. at 536.) Dr. Davis advised Claimant to follow-up with Prestera Center, and continued his Vistaril. (Id.)

*Prestera Center*:

Claimant returned to Prestera Center on September 13, 2012. (Tr. at 739.) Claimant reported anxiety with excessive worrying, agitation, restlessness, and panic attacks several times per day; insomnia with difficulty falling asleep and frequent awakenings; depression with withdrawal, irritability, and loss of interest in previously enjoyed activities; mania with history of not sleeping for days, too much energy, racing thoughts, and impulsivity with history of poor judgment, auditory hallucinations, and low self-esteem. (Tr. at 723.) He stated that he avoided interacting with others due to anxiety. (Id.) He also reported frequent conflict with his mother. (Tr. at 724.) Mental status examination revealed that Claimant was inhibited but had normal appearance, speech, thought content, and memory; deficient coping skills; a blunted affect; agitated psychomotor activity; and full orientation. (Tr. at 724-25.) He was diagnosed with bipolar disorder NOS, agoraphobia with panic disorder, a history of opiate dependence, and was assessed with a GAF of 55.[3] (Tr. at 726-27, 743.) Claimant was assessed with a good prognosis and scheduled for outpatient medication and therapy. (Tr. at 742) On October 25, 2012, it was noted that Claimant continued to have some panic attacks but no side effects from his medications. (Tr. at 717.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence

---

[3] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

because the ALJ failed to consider all of his mental limitations when assessing his RFC. (Document No. 12 at 5-6.) Claimant asserts that in assessing his RFC, the ALJ summarily rejected the opinion of Mr. Given and arbitrarily assigned varying weight to the opinion of Ms. Wilson. (Id. at 6.) Claimant draws attention to Mr. Given's opinions that Claimant was unable to manage his finances, had decreased ability to maintain attendance on a daily basis due to his sleep disorder and intermittent withdrawal symptoms, and had mild deficiencies in social functioning and marked deficiencies in maintaining concentration. (Id. at 5.) Respecting Ms. Wilson, Claimant highlights her opinions that his prognosis was guarded even with psychotropic intervention, he required financial management assistance, and his thoughts of his environment deviated markedly from the expectations of his culture. (Id.) Consequently, Claimant asserts that the ALJ did not consider adequately and accurately all of his mental limitations. (Id.)

In response, the Commissioner contends that substantial evidence supports the ALJ's finding that Mr. Given's opinion was not entitled any weight. (Document No. 13 at 9-12.) Addressing Mr. Given's opinions, the Commissioner first asserts that the opinion predates the relevant period but in any event that the ALJ assessed moderate difficulties in maintaining social functioning, which was greater limitation than assessed by Mr. Given. (Id. at 10.) The ALJ therefore, did not err respecting Claimant's social functioning. (Id.) Second, the Commissioner asserts that although Claimant's concentration on testing was noted as a marked deficiency, his ability to concentrate otherwise was near average. (Id.) The Commissioner points out that Dr. Perdue assessed only mild deficiencies and Ms. Wilson assessed only moderate deficiencies in concentration. (Id.) Third, the Commissioner notes that respecting Claimant's ability to maintain a daily schedule, the record fails to support a sleep disorder diagnosis and his abnormal sleep pattern was mentioned only to Mr. Given. (Id. at 11.) Furthermore, his substance abuse related withdrawal symptoms were in remission. (Id.) Finally, the

13

Commissioner asserts that the ALJ limited Claimant to performing simple, routine, and repetitive tasks that involved only simple, work-related decisions, which excluded financial management. (Id. at 11-12.) Consequently, the Commissioner asserts that the ALJ did not need to address Mr. Given's single limitation regarding financial management. (Id. at 12.)

Respecting Ms. Wilson's opinions, the Commissioner asserts that on examination, Ms. Wilson noted some limitations in social functioning, mood, judgment, memory, and concentration but noted that the exam otherwise, was unremarkable. (Document No. 13 at 12.) The Commissioner contends that the ALJ accommodated Ms. Wilson's limitations in his RFC. (Id.) The Commissioner asserts that Claimant "pulls three statement out of context from other portions of Ms. Wilson's report, and argues that these statements undermine the ALJ's RFC." (Id.) In the proper context, the Commissioner asserts that the statements fail to provide any basis to disturb the ALJ's determination. (Id.) First, the Commissioner asserts that Claimant's prognosis was irrelevant to the ALJ's RFC assessment, which was not dependent on the success of Claimant's treatment. (Id. at 13.) Second, the Commissioner asserts that Claimant failed to identify how the ALJ should have accounted for Ms. Wilson's statement regarding his culture. (Id.) Finally, the Commissioner asserts that Claimant failed to identify any further limitations the ALJ could have assessed to accommodate his requiring assistance in managing his finances. (Id.)  Accordingly, the Commissioner contends that the ALJ's RFC assessment and weight assigned to the opinions of Mr. Givens and Ms. Wilson were supported by substantial evidence. (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ improperly assessed his credibility. (Document No. 12 at 6-7.) Citing Coffman v. Bowen, 829 F.2d 514 (4th Cir. 1987), Claimant argues that he satisfied the requirements of 42 U.S.C. § 423(d)(5)(A), as his allegations and the medical evidence are mutually supportive. (Id.) He asserts

that the objective evidence supports his allegations of disability, as does the opinions of Mr. Given and Ms. Wilson.

In response, the Commissioner asserts that Claimant's argument is based on "an incorrect formulation of the applicable law." (Document No. 13 at 14.) The Commissioner asserts that this Court has advised on multiple occasions that there is no mutually supportive test applicable to the ALJ's assessment of a claimant's credibility. (Id.) Rather, the Commissioner contends that the ALJ was required to use a two-step process, which was utilized. (Id.) In assessing Claimant's credibility, the Commissioner asserts that the ALJ properly determined that Claimant's daily activities were not limited to the extent one would expect given Claimant's subjective complaints and limitations. (Id. at 15.) The ALJ also properly concluded that the objective evidence undermined Claimant's subjective complaints. (Id. at 16.) Finally, the Commissioner asserts that the ALJ properly noted that Claimant failed to comply with prescribed treatment, which undermined his credibility. (Id.) Accordingly, the Commissioner contends that the ALJ's decision that Claimant was not entirely credible, is supported by substantial evidence. (Id.)

Analysis.

1. RFC Assessment.

Claimant first alleges that the ALJ failed to consider SSR 96-9p in assessing his RFC. (Document No. 12 at 5-6.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's

ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2013). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2013).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.   That is, the SSA need not accept only physicians' opinions.   In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and

16

416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2012). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

As stated above, the ALJ found that Claimant was limited to simple, routine, and repetitive tasks, without fast paced production requirements and was capable of making only simple, work-related decisions, with few workplace changes and occasional interaction with the public and co-workers. (Tr. at 15.) The ALJ concluded that Claimant's mental impairments resulted in no restrictions in daily activities or episodes of decompensation of extended duration and moderate

difficulties in maintaining social functioning, concentration, persistence, or pace. (Tr. at 13-14.) Regarding social functioning, the ALJ noted that Claimant was cooperative and maintained appropriate eye contact on examinations. (Tr. at 13.) Respecting concentration, the ALJ noted that treatment notes reflected that he was alert and oriented, had normal thought content, demonstrated some memory deficits, and exhibited a lack of hallucinations or delusions. (Tr. at 13-14.)

The ALJ gave no weight to the opinions of Dr. Given because his opinions were given prior to the period at issue and were inconsistent with the objective and opinion evidence of record. (Tr. at 17.) As stated above, Dr. Given opined that Claimant had mild deficiencies in immediate memory and social functioning; moderate deficiencies in judgment and remote memory; and marked deficiencies in recent memory and concentration. (Tr. at 17, 331, 333.) Dr. Given further opined that Claimant's ability to maintain a daily schedule was hampered by his sleep disorder and intermittent withdrawal symptoms. (Tr. at 17, 334.) The ALJ found that Dr. Given's opinion was inconsistent with the other opinion evidence, which consisted of Ms. Perdue, who opined that Claimant had normal remote memory, social functioning, and persistence; mild deficiencies in judgment, concentration, pace, and immediate memory; and marked deficiencies in recent memory. (Tr. at 17, 336-38.) The ALJ also noted that Dr. Given's opinion was inconsistent with Ms. Wilson's opinion that Claimant had normal persistence, pace, and immediate memory; below average judgment and remote memory; and moderately deficient concentration and recent memory. (Tr. at 17, 501.) Moreover, the ALJ found that Dr. Given's opinion was inconsistent with the opinion of the State agency medical consultant, Dr. Boggess, who assessed only moderate limitations in social functioning, concentration, persistence, or pace; moderate limitations in his ability to interact with the general public and understand, remember, and carry out detailed instructions; and no restrictions in daily activities or episodes of decompensation. (Tr. art 17, 504-

18

20.) Dr. Given's assessed marked deficiencies in concentration therefore, were inconsistent with all the other evidence of record.

Although Dr. Given assessed only mild deficiencies in social functioning, the ALJ assessed a greater limitation and found that Claimant had moderate difficulties in maintaining social functioning. (Tr. at 13.) Consequently, the ALJ limited Claimant to work that involved only occasional interaction with the general public and co-workers. (Tr. at 15.)

Claimant takes issue with the ALJ's failure to rely upon Dr. Given's opinion that his sleep disorder and intermittent withdrawal symptoms prevent him from maintaining a daily work schedule. As the Commissioner notes, the record is void of any evidence of a diagnosed sleep disorder. Dr. Given noted Claimant's subjective complaints that he fell asleep at five in the morning and awoke at four in the evening. (Tr. at 333.) The record does not indicate otherwise such extreme sleep patterns. Respecting his symptoms of withdrawal, Claimant testified at the administrative hearing that he no longer took illicit drugs or drank alcohol. (Tr. at 41-42.) Accordingly, any error that the ALJ may have committed in assigning no weight to this opinion of Dr. Given's is harmless.

Finally, Claimant notes Dr. Given's opinion that he should not manage his finances. Claimant however, fails to specify any limitation resulting from this inability, and therefore, the Court finds that Claimant's argument is without merit. The Court notes that both the ALJ and the Commissioner stated that Dr. Given's opinion preceded the relevant period at issue. Claimant filed his applications for DIB and SSI on February 23, 2011, and alleged an onset date of January 1, 2008. (Tr. at 10, 142-47, 148-56, 167, 171.) Claimant confirmed the January 1, 2008, alleged onset date at the administrative hearing. (Tr. at 30.) The Court found no indication in the record that Claimant amended his alleged onset date. Accordingly, the Court finds that Dr. Given's opinion

was given within the period of time relevant to Claimant's application for DIB: from his alleged onset date, January 1, 2008, through his date last insured, December 31, 2008. Although the ALJ stated that the timing of Dr. Given's opinion was one reason he gave his opinion no weight, it is clear from the ALJ's decision that he also assigned the opinion no weight because it was inconsistent with the other evidence of record. Accordingly, the Court finds that any error the ALJ may have committed in finding that Dr. Given's opinion preceded the relevant period, is harmless.

The ALJ gave great weight to the opinion of Ms. Wilson because her opinion generally was consistent with the medical and opinion evidence of record. (Tr. at 17.) Claimant takes issue with the ALJ's failure to acknowledge Ms. Wilson's opinion that his prognosis was guarded. As the Commissioner asserts, the ALJ's RFC was not dependent on the success of Claimant's treatment, but on his ability to function during the relevant period. Therefore, the ALJ was not required to address Ms. Wilson's prognosis. Claimant also takes issue with the ALJ's failure to acknowledge Ms. Wilson's statement that his thoughts about his environment deviated markedly from the expectations of his culture. Ms. Wilson made such a statement when she diagnosed personality disorder NOS. (Tr. at 502.) She stated that such diagnosis was given due to Claimant's "enduring pattern of perceiving, relating to, and thinking about the environment and himself that deviates markedly from the expectations of his culture." (Id.) Claimant however, does not identify any limitation that should have been assessed on the basis of such statement. As the Commissioner suggests, to the extent that such a limitation could be assessed, the ALJ accommodated the limitation when he limited Claimant to making only simple, work related decisions. In the absence of any proposed limitation from Claimant, the Court finds the Commissioner's position prevailing and finds that the ALJ did not commit any error as Claimant alleges.

Finally, Claimant takes issue with Ms. Wilson's statement that Claimant required

assistance in managing his finances. As discussed above, Claimant fails to identify any limitation that should have been assessed based on Ms. Wilson's statement. Ms. Wilson did not identify any limitations, as well. Accordingly, the Court finds that Claimant's argument is without merit.

In view of the foregoing, the Court finds that the ALJ properly reviewed the opinion evidence of record and that the weights assigned to the opinions of Dr. Given and Ms. Wilson are supported by the substantial evidence of record. The Court further finds that the ALJ's RFC assessment is supported by substantial evidence of record.

2. Claimant's Credibility.

Claimant also alleges that the ALJ erred in assessing his credibility. (Document No. 12 at 5-6.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2013); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). A claimant's "statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. §§ 404.1529(a) and 416.929(a) (2013). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Craig v. Chater, 76 F.3d at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). In Hines v. Barnhart, 453 F.3d 559, 565 n.3 (4th Cir. 2006) (citing Craig v.

21

Chater, 76 F.3d at 595), the Fourth Circuit stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2013). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2013).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.   For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.   A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the

individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 15.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 17.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 16-18.) At the second step of the analysis, the ALJ concluded that "the [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 16.)

Claimant argues that under the mutually supportive test recognized in Coffman v. Bowen, 829 F.2d 514 (4th Cir. 1987), that he satisfies the requirements of 42 U.S.C. § 423(d)(5)(A), because the evidence of record, including his testimony and statements, is supported by substantial evidence. (Document No. 12 at 6-7.) Claimant has misinterpreted the holding in Coffman. In that case, the issue was not one of credibility but whether the ALJ applied the appropriate standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. Coffman, 829 F.2d at 517-18. The Fourth Circuit concluded that the ALJ had misstated the legal principles and standards and improperly discounted the physician's opinion due to a lack of corroborating evidence. Id. at 518.

24

The Court held that the correct standard required a treating physician's opinion to be "ignored *only* if there is persuasive contradictory evidence." Id. There, the physician provided medical reports with his opinion letter. Id. The record also included findings of two other physicians and the testimony of the claimant. Id. In view of the of the supporting evidence, the Fourth Circuit noted that [b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of the Social Security Disability Benefits Reform act of 1984, 42 U.S.C. § 423(d)(5)(A)." Id. Accordingly, the undersigned finds contrary to Claimant's argument that Coffman fails to offer any "mutually supportive" test applicable to assessing a claimant's credibility. For the reasons set forth herein, the undersigned finds Coffman inapposite and Claimant's argument without merit.

Respecting Claimant's mental impairments, the record reflects that the ALJ assessed Claimant's credibility pursuant to the Rules and Regulations. The ALJ acknowledged Claimant's testimony that his impairments affected his memory and ability to talk, complete tasks, concentrate, understand, follow instructions, and get along with others. (Tr. at 15.) Claimant also testified as to his perceived limitations. (Id.) The ALJ next acknowledged Claimant's reported daily activities. Claimant was able to care for his personal needs, was able to cook and clean, took out the trash, mowed the yard, was capable of driving, and watched television. (Tr. at 15-16.) The ALJ also considered the objective medical evidence, as summarized above, which demonstrated that Claimant did not have any limitations greater than those assessed by the ALJ. (Tr. at 16-18.) The ALJ properly considered the opinion evidence of record, as well. (Id.) The ALJ further noted that Claimant did not any side effects from his medication and that the medication effectively controlled his symptoms. (Tr. at 17.) Finally, the ALJ acknowledged that Claimant was not compliant entirely in taking his prescribed medication. (Id.)

In view of the foregoing, the Court finds that the ALJ properly considered Claimant's symptoms and credibility pursuant to the appropriate Rules and Regulations, and that Claimant's argument that he should have applied the mutually supportive test is without merit. Accordingly, the Court finds that the ALJ's pain and credibility assessment is supported by the substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

.      The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 23, 2016.

Omar J. Aboulhosn
United States Magistrate Judge